HARRISON LEE CARTON, a Minor, by His Next Friend, CHARLES O. CARTON, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—102 S. W. (2d) 608.

Division Two, March 11, 1937.

*Joseph W. Jamison, Henry S. Conrad, L. E. Durham, Hale Houts* and *I. M. Lee* for appellant.

*Kennard & Gresham, F. M. Kennard* and *Walter J. Gresham* for respondent.

WESTHUES, C.—This case, coming to the writer on reassignment, is an appeal, by the St. Louis-San Francisco Railway Company, from a judgment in respondent's favor in the sum of $12,500. In the course of the opinion appellant will be referred to as the railroad, and respondent as plaintiff. Plaintiff sued the railroad to recover damages for injuries alleged to have been sustained when he was struck by a railroad car as he attempted to cross the track of the railroad in the yards at Carthage, Missouri. The suit was filed and tried at Kansas City, Missouri.

At the close of all the evidence the railroad offered an instruction directing the jury to return a verdict in its favor, which was refused by the trial court, and this ruling was preserved for our review. Plaintiff's evidence, giving it every favorable inference warranted, discloses substantially the following state of facts. Plaintiff was sixteen years of age at the time he received the injury complained of. He lived with his parents in Carthage, a short distance from the scene of the accident. On July 25, 1930, at about three P. M., plaintiff intended to go swimming in a creek, located to the north of the railroad tracks. Plaintiff lived south of the tracks. In going to the creek plaintiff followed a path toward the railroad tracks, and the evidence most favorable to plaintiff justifies the statement that this path led across the railroad tracks to the north, and for a number of years had been used by many people as a footpath, also, that the railroad had knowledge of this fact. The evidence disclosed that at this point there were three parallel tracks, that is, a passing track on the north, a main line track in the center and a coal track to the south. There were also a number of service tracks branching off both to the north and south from the main line. The accident occurred

on the south, or coal track, about one hundred feet or more to the east of a small building, referred to in the evidence as the fertilizer house. When plaintiff reached the coal track he noticed two boys in a railroad car gathering wheat which had been left in the car. Plaintiff testified that there were two cars standing upon the coal track. The one the boys were in was standing across the pathway he intended to follow. Plaintiff further testified that he talked to these two boys about two or three minutes and then proceeded to the west end of the car and across the track; that at the moment he placed his foot upon the first or south rail there was a collision and the car struck him. The wheel of the car caught his foot and crushed it. Infection followed and plaintiff's foot was amputated a few inches below the knee. Plaintiff testified that after the accident he saw a third car upon the coal track to the east of the two cars, and it was this car that had rolled down the coal track and collided with the cars on the path and caused them to move to the west. The evidence disclosed that the three tracks mentioned above ran to the east from the point of the accident in a straight line so that cars could be seen upon the coal track from any point where plaintiff was before the accident, until he stepped behind the car.

We have come to the conclusion that plaintiff's own evidence convicts him of negligence as a matter of law. We quote the portions of evidence pertinent to this issue, as given by plaintiff and his witnesses. Willard Ambrose, one of the boys who was in the railroad car at the time of the accident, testified as follows:

"Q. Were you down in the yards on July 25th, 1930, when Harrison Carton was hurt? A. I was.

"Q. Where were you at the time? A. At the time he was hurt?

"Q. Yes. A. In a box car, picking up wheat. . . .

"Q. Now, while you were there in the cars, or car, who came up? A. Harrison.

"Q. Harrison Carton? A. Yes, Harrison Carton.

"Q. And, did you talk with him? A. Me?—I didn't talk with him; Russ. Hatcher did.

"Q. Who did? A. Russ.

"Q. He and Russell were talking together? A. Yes, sir.

"Q. Did he stay there very long? A. Well, no.

"Q. Then, did he leave? A. He left, yes.

"Q. What was the next thing that came to your attention? A. The next thing that came to my attention was a jolt.

"Q. What sort of a jolt? A. A heavy jolt.

"Q. I think you said you had been down around the yards considerably? A. I have.

"Q. Have you heard box cars bump together? A. I have.

"Q. And, describe the sound that came when this jolt came—

what was it like? A. A couple hitting together, a slam, and the brakes and wheels kind of squeaking.

"Q. What did it do to you? A. Throwed me on the floor.

"Q. It throwed you on the floor, very hard? A. Skinned me up, on my arms.

"Q. What did you next notice or hear? A. I heard Harrison, or some boy, I didn't know who at the time being, hollering.

"Q. What did you do then? A. I jumped out of the car and ran up to him."

On further examination he testified:

"Q. Did you hear an engine working in the yards, when switching was going on, after you got into the car? A. I did.

"Q. You could hear it moving around? A. Switching in the yard.

"Q. You could hear cars moving? A. Yes, sir.

"Q. Where was the engine you heard? A. Which direction, I don't know. . . .

"Re-Direct Examination by Mr. Gresham.

"Q. When had you heard that engine? A. Oh, just a little bit after I got in the car.

"Q. You didn't hear it just before Harrison was hit, did you?

"Mr. Lee: Objected to as leading.

"The Court: Objection sustained.

"Q. Did you hear it just before Harrison was hit? A. I heard it before he was hit, yes.

"Q. I mean at the instant he was hit? A. No, I don't remember whether I did or not.

"Recross-Examination by Mr. Lee.

"Q. You say you don't remember whether you did or not? A. No.

"Q. Did you hear the cars moving around, or being switched? A. Before Harrison was hit?

"Q. Yes, sir. A. I heard them then, yes, sir.

"Q. You heard the cars moving? A. Yes, sir.

"Q. The rumbling of the cars? A. Yes, sir, but it was at a great distance; must have been, because I could not hear them very good."

Plaintiff testified as follows:

"Q. Then, while you were standing there talking to them, did you look up the track, to your right? A. Yes, sir.

"Q. Did you see any engine or anything up there? A. I saw an engine about a block away.

"Q. On what track was it? A. It looked to be on the main track.

"Q. Looked to be on the main track? A. Yes, sir.

"Q. Was there any car or engine on this switch track? A. No.

"Q. Then, did you look up there any more after you glanced up

there and saw there was none there? A. Well, just before I got to the railroad track, I glanced.

"Q. Just before you got to the railroad track, before you got to the cars? A. Yes, sir, I looked to see if there was any cars.

"Q. Did you see any? A. No.

"Q. And, then after you finished talking with the boys, what did you do? A. I just started around the end of the car, just stepped my foot upon the track. The big collision, sounded like box cars hitting together, and run over my foot, knocked me down and dragged my foot.

"Q. Did it drag it some distance along the rail? A. Yes.

"Q. What did it do to your foot? A. It smashed my foot, and the bone was sticking out on top, and there was blood on it.

"Q. Now, just before you stepped onto the track there, did you hear any whistle, bell, or any other signal? A. No."

On cross-examination he testified:

"Q. Now, you say, as you went up to this car, and before getting to the car where the boys were, you saw an engine up towards the east? A. Yes.

"Q. Of the car the boys were in? A. Yes, sir.

"Q. Now, how far east? A. Oh, it was a block or more.

"Q. Was it standing or moving? A. Well, it was standing still; just barely moving, if at all.

"Q. Now, while you were talking to the boys, did you hear that engine moving, operating, and cars moving? A. No.

"Q. You were not paying any more attention to it? A. No.

"Q. How is that? A. No. . . .

"Q. Then when you got to the end of the car, you turned your direction from west, or along parallel, alongside of the track, directly across the track, walking to the north? A. Yes, sir.

"Q. And, as soon as you stepped on the first rail, that is when you say the car struck you? A. Yes.

"Q. Now, how far do you think you stepped onto the rail ahead or to the west of where the wheel was resting on the rail? Were you just right close to the end of the car? A. Yes.

"Q. In other words, how far did this car move, was it necessary for it to move, before the wheel would touch your foot, where you stepped on the rail? A. I don't know. I was right at the end of the car.

"Q. You were right at the end of the car? A. Yes, sir."

Plaintiff further testified that after he was injured he looked and saw at least one additional car upon the coal track to the east. Note his evidence:

"Q. And then, after you sat down there, did you look to see what it was that had struck you? A. Yes, sir, there was box cars on the track there.

"Q. In addition to the two that were there when you went down there? A. Yes.

"Q. Was there any engine around there? A. No, there was no engine.

"Q. And those box cars, was there more than one additional there? A. Well, I don't know for sure, but I think there was just one.

"Q. Did you see any man on it? A. No."

Again on cross-examination, with reference to what occurred immediately before the injury, he testified:

"Q. Now, when you turned to go across the track, across and around the west end of this car that the boys were in, when you turned there, was it the first step you made, as you went on the rails, that the car moved? A. Just as soon as I stepped my foot upon the rail, the car hit, and run right across my foot, and drug me along.

"Q. But you were walking—you were walking west from the door of the car, which would be about midways of the car? A. Yes, sir.

"Q. And that is about how long—how long is that car—an ordinary box car? A. It was the regular grain car, I guess.

"Q. Something like forty feet long? A. In my judgment, about that."

And, as to where the car was standing prior to the accident, plaintiff stated:

"Q. How far was it from where it started, when it stopped? A. I don't know the exact distance, but right on the path, because I came up the path, and it was directly on the path.

"Q. There were two cars together? A. Yes, sir.

"Q. Which one was on the path? A. The one I was—

"Q. (interrupting): This one, or the other one (indicating)? A. The one that the boys were in was on the path."

It is evident from plaintiff's evidence that the car was standing upon the footpath where it crossed the coal track. Plaintiff was not upon the path at the time he was injured, but granting that plaintiff was a licensee, certainly he could be no more, still we are of the opinion that he was guilty of negligence so as to preclude a recovery against the railroad. Plaintiff saw a switch engine about a block to the east as he approached the track. It was a switching movement from that direction that caused his injury. Plaintiff's own evidence shows that he talked to the boys in the car for a few minutes, then walked directly to the west and without looking attempted to pass over the track within a few feet of the car. In fact, so close that his foot was caught almost immediately following the impact of the cars. Had he but glanced to the east, at any time while he was walking from the center of the car where he left the boys, and before he stepped behind the car, he would have seen the railroad

car rolling toward the stationary cars behind which he wished to pass over the track. The car rolling towards him was less than one hundred feet away during all that time. Had he looked, he would have seen. The boys in the car had heard prior switching movements farther away. The physical facts disclose that plaintiff could have seen the car coming a long distance away. Under the adjudicated cases we must rule that the trial court erred in not directing a verdict for the railroad. This very question was recently discussed at length and many cases reviewed in the case of Carner v. St. Louis-S. F. Ry. Co., 338 Mo. 257, 267, 89 S. W. (2d) 947. The evidence in the Carner case was not as clear and convincing against Carner, as the evidence in this case is against the plaintiff. In the Carner case we said:

"Having determined from the physical facts that the locomotive was within the vision of plaintiff as he proceeded north along the private road, plaintiff's failure to see the approaching locomotive when he looked, as he says he did look, constituted negligence as a matter of law directly contributing to his injuries."

In this case plaintiff's evidence showed that he did not even look to see if cars were coming. The fact that he did look, a few minutes prior to the accident, and saw a switching engine to the east, even though it was upon an adjoining track, was notice to plaintiff that a train crew was in the process of switching cars in that locality. Plaintiff was acquainted with the yards and knew the conditions. In the case of Dyrcz v. Mo. Pac. Ry. Co., 141 S. W. 861, 238 Mo. 33, l. c. 46, 47, we find the following, which we deem applicable to the plaintiff in this case:

"On such a record it must be held there was no case for the jury. Because:

"(a) In the law of negligence a railroad track in and of itself is an unequivocal and large sign of danger. It stands there mutely but unmistakably crying aloud, 'Danger!' It is much the same as if one stood there and with a trumpet called out, 'Beware!' 'Look out for the cars!' 'Listen for the cars!' 'Look out for yourself!' 'Look well to what you are about to do for you are taking your life in your hands!' 'Use your eyes!' 'Use your ears!' 'Use your common sense!' Accordingly, as a general rule, in the administration of justice in this kind of case, a person in the act of crossing such track must before entering on it look and listen. If he does not and is injured in crossing he is guilty of negligence, he contributes to his own injury and is hurt by his own fault. In such case, the best the law can do is to leave him where he puts himself; for no action lies. Moreover, given daylight and no obstructions, given a situation where to look is to see, then such person is conclusively held to see; for on that hypothesis looking is equivalent to seeing."

To say more would be mere repetition of what has been so often said in prior cases. For a review of many of these, see the Carner case, supra. The judgment is reversed. *Cooley* and *Bohling, CC:,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.